**UNITED STATES et al. v. INSURANCE CO. OF NORTH AMERICA et al.**

**SAME v. CHASE BANK et al.**

**SAME v. LIEBERMAN & WAELCHLI & CO. et al.**

**Nos. 5146–5148.**

Circuit Court of Appeals, Fourth Circuit.

Jan. 21, 1944.

Arnold W. Knauth, Atty., Claims Division, Department of Justice, of Washington, D. C. (Francis M. Shea, of Washington, D. C., Bernard J. Flynn, of Baltimore, Md., and J. Frank Staley, of Washington, D. C., on the brief), for appellant.

Robert W. Williams and Theodore R. Dankmeyer, both of Baltimore, Md. (Ritchie, Janney, Ober & Williams, of Baltimore, Md., Bigham, Englar, Jones & Houston, Hill, Rivkins & Middleton, and Ezra G. Benedict Fox, all of New York City, Southgate L. Morison and Niles, Barton, Morrow & Yost, all of Baltimore, Md., and James McKown, Jr., of New York City, on the brief), for appellees.

Before PARKER and DOBIE, Circuit Judges, and WARING, District Judge.

WARING, District Judge.

"The Fund," which appears as the appellant in this cause, consists of moneys deposited with the Treasurer of the United States on account of just compensation for the Danish vessel, "Anna Maersk", which was taken over by the United States.

It appears that in February, 1940, after Germany had commenced its war on Poland, but while Germany, Denmark and the United States were all officially at peace, the Danish M. V. Peter Maersk, with cargo from the United States, sailed for Japan and other eastern countries via the Panama Canal. Shortly after clearing the canal the vessel had trouble with some of her cargo and as a result certain lots of damaged cargo were discharged in this country and others carried to destinations in Japan and China. In early April, 1940, Germany invaded and occupied Denmark and the seat of the Danish government remained where it was so that there is no government in exile for that country. In August, 1943, Germany overthrew the Danish government and took complete charge of the country. When the Peter Maersk arrived at Hong Kong it was seized by the British government. The record does not disclose what became of the vessel or cargo, but presumably the ship was taken over as a prize by the British government since another vessel of the same line was so taken approximately the same time. The Anna Maersk, owned by the same Danish steamship company, took refuge in Baltimore, Maryland, and there remained until it was requisitioned by the United States. As of April 8, 1940, the President of the United States "froze" all money transactions in respect of Danish corporations by Executive Order No. 8389, 12 U.S.C.A. § 95 note, such order being dated April 10th of the same year and later other orders of the same or similar character were issued whereby payments of money and transfers of evidence of indebtedness with Denmark or its nationals were prohibited. Certain of the cargo damages and losses on the Peter Maersk's voyage were paid by various cargo underwriters and they were

thereby subrogated to the rights of such cargo owners against the owners and operators of the Peter Maersk in personam and against the ship in rem. The Peter Maersk was not available for enforcement of the in rem liens. A number of libels in personam with writs of foreign attachment of the Anna Maersk were filed in the District Court of Maryland in which it was alleged that the owners and operators of the Anna Maersk were Danish corporations and also the owners and operators of the Peter Maersk. Certain of these libels were consolidated and regrouped under the three cases involved in this appeal, namely: (1) No. 5147, The Chase Bank et al. v. The Fund; (2) No. 5146, Insurance Company of North America et al. v. The Fund; and (3) No. 5148, Lieberman et al. v. The Fund.

When the United States took over the Anna Maersk it set aside as a payment on account of just compensation for the same the sum of $100,000, and that is the amount now in "The Fund" from which the libellants in the three above entitled causes claim they should be paid the amounts due them as a result of their claims against the foreign parties who were the owners of both the Anna Maersk and the Peter Maersk.

The United States appears as claimant for the fund, and takes the position that it is in effect holding trust funds for the benefit of the owners and operators of the Anna Maersk and for all claimants or others having any interest in or claims against such vessel or its owners; and the government takes the position that all of this fund should be held intact and without diminution until such time as any and all claims of whatsoever character may be presented and adjudicated; and it further takes the position that to pay out any part of such fund now might have the effect of creating a preference to those claimants who have appeared in this cause. The government further points out that these are not claims against the Anna Maersk itself and that that ship is not in any way indebted to any of the libellants, but that all of their claims arose as a result of the operation of another vessel, the Peter Maersk, and that while they may have had maritime liens against the latter vessel for their claims, they have no superior claims or claims in rem against the Anna Maersk and that there may be in existence liens not yet presented or known against

the Anna Maersk itself, which would be entitled to priority. The government points out that all funds being frozen, and there being no Danish government with which communication can be had, and the Danish owners being under the heel of a foreign foe, they are in no way situated whereby they can appear and protect their rights, and that there may be claimants or holders of superior liens by way of mortgage, or for repairs, or other high ranking claims, who, by reason of the war, are prevented from appearing in this cause. The government, therefore, appeared and prayed that all funds be held until the conclusion of the war or such reasonable time wherein it might be apparent that there is an opportunity for free and untrammeled presentation of any claims, if such there be. On the other hand, the claimants contend that they have already presented their claims and shown that the owners and operators of the vessel are indebted to them and that the fund on hand having been deposited for the benefit of the owners and operators, the claimants should be paid from such fund.

The Anna Maersk was requisitioned by the United States government on July 12, 1941, so that about two years and a half have elapsed since the United States took it over and no one has appeared to claim or demand the ship or the funds. Under the Act of June 6, 1941, 55 Statutes at Large, 242, Title 50 U.S.C.A.Appendix, § 1271 (commonly referred to as the "Idle Foreign Merchant Vessels Act"), the President is authorized to take over title to any foreign merchant vessels lying in the waters of the United States and just compensation shall be paid to the owner or owners of such vessels and such compensation shall be deposited with the Treasurer of the United States and the funds so deposited be available for the payment of such compensation and subject to the payment of any valid claims by way of mortgage, maritime liens or attachment liens. Under that Act the holders of any claims were required to bring suit in the District Court from whose custody the vessel had been taken, or in whose territory or jurisdiction the vessel was lying. Such suit must be brought within six months after the deposit is made. The claimants are thus required to act with promptitude.

The appellees held attachment liens against the Anna Maersk at the time she was requisitioned and the Act expressly

provides that the fund deposited as compensation for a vessel shall be subject to be applied to the payment of any valid claims on an "attachment lien".

In the case at bar considerable point has been made of the fact that no representative of the Danish government has appeared and no one authorized to act for the owners is in court and that there may be many defenses and prior claims or liens to those filed by the appellees. It appears that the orders in this case were consented to by the law firm of Niles, Barton, Morrow and Yost, who appeared as proctors on behalf of the owners of the vessel and consented to the decrees of the District Court ordering the payment of libellants' claims from the fund. The United States makes the point that there is no authority or power of attorney of record, which shows the authority of these proctors to make this consent. It appears this legal firm has represented these parties before; entered into negotiations on behalf of the owners with various parties, including representatives of the United States, with a view to settling all of these matters; and had appeared on behalf of the same owners in other litigation; and they appeared in open court before the District Judge, stating that as officers of that court they were representing the foreign owners, and nothing was presented by the government to indicate that the attorneys were not acting in good faith and properly authorized. We see no reason to differ with the District Court and find no indication of any impropriety in the claim of these proctors who are well known to this and the District Court.

"Proctors are more properly appointed by the party in writing; but there is no legal necessity for a written proxy: a verbal appointment is sufficient and the court presumes, in the absence of denial, that the proctor who appears has proper authority. The court may always call upon him to state for whom he is authorized to appear.

"If the party have a proctor and advocate, he cannot conduct the cause himself nor can he call to his assistance one who is not a proctor or advocate of the court." Benedict on Admiralty, 6th Ed., § 172 (Volume 1, page 417).

"It is true that ordinarily there is a presumption that an attorney-at-law who appears in regular manner on behalf of a party litigant has authority to do so, and one who would successfully challenge his authority must present substantial proof that the authority is lacking (Booth v. Fletcher [69 App.D.C. 351], 101 F.2d 676, 683, see cases cited in footnotes 22 and 23)." Liggett & Meyers Tobacco Co. v. The Maliakos, D.C.[1]

As to the power of an attorney to represent a client, the presumption is that he has such unless something to the contrary is shown. The United States Court of Appeals of the District of Columbia says:

"* * *, the presumption is that an attorney at law who appears in regular manner on behalf of a party litigant has authority to do so; and one who would successfully challenge his authority must present substantial proof in the form of countervailing evidence that authority is lacking, in order to justify, on that ground, an order to strike a pleading from the files." Booth v. Fletcher, 69 App.D.C. 351, 101 F.2d 676, 683.

The appellant urges upon this court that the District Court failed to recognize the fact that the attachment liens of the libellants were of an inferior rank and were not really liens in rem against the Anna Maersk, but merely represented claims which could be enforced by an action in personam. While this is true, nevertheless, no superior liens have been filed and no one has appeared who is injured by, and has a right to make any complaint as to, priority being given to those in suit. There is no question pending here or quarrel between parties as to ranking their claims. The complainant here is a mere stakeholder. We are not at all impressed with the argument that because these claims are not of the highest rank of liens they should not be paid merely because time may show that there are higher ranking liens or claims. We are faced with the realistic fact that these claims have been put in suit and The Fund, which is the proceeds arising from the government taking over the Anna Maersk, is liable for the debts of the owners of that ship. These attachment liens are valid and in the absence of any superior claims or liens appearing should be satisfied from The Fund.

---

[1] No opinion for publication.

In the same District Court from which this appeal is brought, in the case of Sitnek et al. v. Fund Deposited with Treasurer of United States, 49 F.Supp. 72, 74, the government appeared and argued that it was entitled to retain The Fund and urged that no distribution should be made until it could be determined whether the owners of the vessel were entitled to The Fund by way of just compensation and also what may be the extent of any other valid claims against The Fund.

Answering this the court says: "We are not favorably impressed with this suggestion. If adopted, it might 'freeze' the fund indefinitely to the prejudice of the present claimant, the exact amount, validity and priority of whose claims are definitely determined and admitted. No question of apportioning the fund arises. Each case must be dealt with upon its own separate facts. The statute, in addition to making the fund available for the payment of just compensation to the owners of the vessel, expressly makes it 'subject to be applied to the payment of the amount of any valid claim by way of mortgage or maritime lien or attachment lien' upon the vessel."

The case of Watts, Watts & Co. v. Unione Austriaca, etc., 248 U.S. 9, 39 S. Ct. 1, 63 L.Ed. 100, 3 A.L.R. 323, is cited by appellants as authority for postponing the payment of these funds until after the war is concluded, but the situation in that case was quite different. There the actual claim was in litigation and counsel on behalf of the ship owners who were alien enemies urged the court to stay a hearing because they were unable to communicate with their clients and present a proper defense. In the instant case counsel for the foreign owners appeared and actually consented to the decrees of the District Court; and the complaint that there was a premature decision is not made by the party against whom the claim is filed, but by a mere stakeholder who is not in any way liable or responsible, except to safeguard the fund and pay it out as may be directed by a court of competent jurisdiction.

The government does not very seriously attempt to attack the validity of the claims against this fund and its position before the District Court and before this appellate court is that the whole matter should be held in abeyance until such time as the world may be freed of war and any parties anywhere might have an opportunity to appear and put in such claims as they might hold. The question of how long funds should be held and the disposition thereof is largely, if not entirely, a matter of sound discretion. We do not find any authority of law, nor do we intend to lay down any rule to govern the handling and disposition and allowance of claims against this class of fund. We considered this case solely upon the facts and circumstances adduced in it and are not passing upon it as a precedent except to say that it is a matter in our opinion which should lie within the sound discretion of a trial judge and so long as that discretion is exercised soundly and wisely it is not for us to interfere. We have carefully considered this matter and have reached the opinion that in view of the position and standing of the parties; in view of Judge Coleman's knowledge of the evidence leading up to the litigation; and of the nature of the claims and the parties involved, and those representing them; and in view of all the other circumstances, that he exercised a sound and wise discretion in ordering the payments from The Fund as shown in his respective orders, and we agree thoroughly with him as to his findings of fact and conclusions of law in this particular case and hold that his decrees should be affirmed and carried out.

There is one other point, however, raised in the case which should be noted and in affirming the decrees of the District Court an additional requirement should be made before actual payment of the funds is had. The government makes the point that under the Act of Congress known as "Trading With the Enemy Act", October 6, 1917, 40 Statutes at Large, 411, with amendments, Title 50 U.S.C.A.Appendix, § 1 et seq., such part of these funds as are held for the benefit of alien enemies should not be paid over without first obtaining a license under the terms of that Act and the Executive Orders issued thereunder. We believe that as a practical matter the Treasurer of the United States could not be compelled to pay until such a license is produced, so in affirming the decree of the District Court we are modifying it to the extent that the District Judge shall insert in its final decree in one of these cases, namely: No. 5148, a clause protecting The Fund by requiring proper licenses. A supplemental decree as to Case No. 5148 should be issued containing the following proviso:

"Such part of the decree below in No. 5148 as orders the Treasurer of the United States to pay into the Registry of the District Court, the sum of $4,435.60 out of the fund deposited with the Treasurer of the United States on account of compensation for the taking of the Danish M/V Anna Maersk is modified so as to provide that the payment of such sum of $4,435.60 shall be subject to license from the Secretary of the Treasury of the United States under Executive Order No. 8389 as amended, and all applicable rules and regulations issued thereunder."

With the modification hereinabove indicated the decrees of the District Court are affirmed.

No. 5146 Affirmed.

No. 5147 Affirmed.

No. 5148 Modified and affirmed.